NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0221n.06

Nos. 12-5028/14-5911

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
May 10, 2023
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| KENNATH ARTEZ HENDERSON, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF TENNESSEE |
| TONY MAYS, Warden, | ) | |
| | ) | OPINION |
| Respondent-Appellee. | ) | |
| | ) | |

**Before: CLAY, McKEAGUE, and WHITE, Circuit Judges.**

WHITE, J., delivered the opinion of the court in which CLAY and McKEAGUE, JJ., joined. WHITE, J. (pp. 35–37), also delivered a separate concurring opinion.

**HELENE N. WHITE, Circuit Judge.** In 1998, Petitioner-Appellant Kennath Henderson pleaded guilty of first-degree murder in a Tennessee state court and was sentenced to death by a judge. After unsuccessful state post-conviction proceedings, he filed a habeas petition under 28 U.S.C. § 2254. He now appeals the denial of that petition. Certified for review are Henderson's claims that (1) trial counsel was ineffective in advising Henderson to plead guilty and waive jury sentencing; (2) Henderson was not competent to take either of those actions; (3) trial counsel was ineffective at sentencing; and (4) trial counsel was ineffective in using expert services. We AFFIRM.

# I. BACKGROUND

## A. Henderson Kills Deputy Tommy Bishop

On May 2, 1997, Henderson—an inmate at the Fayette County Jail—shot and killed Deputy Tommy Bishop during an escape. *State v. Henderson*, 24 S.W.3d 307, 310 (Tenn. 2000). Henderson was serving a sentence for aggravated burglary and felony escape. About a week before the shooting, Henderson's girlfriend smuggled a pistol into the jail, and a few days later, Henderson requested dental work on a tooth he needed to have pulled. The appointment was made with Dr. John Cima, and on May 2, Deputy Bishop took Henderson and another inmate to Dr. Cima's office.

At the office, Henderson was placed in a treatment room while Deputy Bishop remained in the reception area and spoke with the receptionist. As Dr. Cima and his assistant began the tooth-extraction process, Henderson pulled out his pistol. Dr. Cima reached for the gun and a struggle ensued. Dr. Cima called out for Deputy Bishop, who rushed into the treatment room. As Deputy Bishop arrived, Henderson regained control of the pistol and fired a shot that grazed Deputy Bishop's neck. The shot caused Deputy Bishop to fall backwards and hit his head on the doorframe or wall and fall face-down on the floor, "presumably unconscious." *Id.* Henderson left the room and came back with the receptionist in his custody. He took Deputy Bishop's gun and Dr. Cima's money, credit cards, and truck keys. He then ordered Dr. Cima and the receptionist to accompany him out of the building. But just before leaving the building, Henderson went back to the treatment room and fatally shot Deputy Bishop in the back of the head at point-blank range. Deputy Bishop had not moved since hitting his head and was still lying face-down when Henderson shot him.

Dr. Cima and the receptionist managed to escape when Henderson was startled by another patient; Henderson drove off in Dr. Cima's truck. After a police car began following him,

Henderson sped away. He eventually drove off the road and into a ditch, and was taken into custody. When police searched the truck, they found the murder weapon, personal items taken from Dr. Cima's office, and Deputy Bishop's gun.

## B. State-Court Direct Proceedings

### 1. Henderson Pleads Guilty and Waives Jury Sentencing

A grand jury indicted Henderson on one count of premeditated murder; three counts of felony-murder; two counts of especially aggravated kidnaping; and one count each of attempted especially aggravated kidnaping, aggravated robbery, aggravated assault, and felonious escape. Henderson was indigent, so Judge Jon Kerry Blackwood appointed two lawyers to represent him: Andrew Johnston and Jerry Michael Mosier. Mosier was lead counsel; Johnston was a relatively new lawyer who had never defended a capital case.

From December 1997 through February 1998, Henderson wrote at least four letters to Mosier and Johnston either asking about the consequences of pleading guilty or expressly stating his desire to plead guilty to avoid the death penalty. For example, in a December 21, 1997 letter, he asked if it would help his case to "not go[] before the jury and plead[] guilty before the judge" in the hope that the judge would "grant a form of mercy and exclude the death penalty." R. 23-13, PID 3351. The letter also asked counsel to find out if Deputy Bishop's family were opposed to the death penalty, willing to say so to the judge, and "if so, [whether] that [would] be a help in my case along with pleading guilty and not going before a . . . jury." *Id.* In a January 11, 1998 letter, he stated: "[t]o be honest, I personally do not want to appear before a jury during trial. I wish so much to be able to only appear before the judge with a plea of guilt and . . . a plea of

mercy and justice." *Id.* PID 3357. Two subsequent letters reiterated Henderson's desire to plead guilty to avoid the death penalty.[1]

These letters also raised concerns about the impending trial, then set for March 9, 1998. Henderson repeatedly voiced his desire that his lawyers request a change of venue, a change of judge, and an extension of the trial date. R. 23-1, PID 3357-58, 3361, 3370, 3373.[2] Trial counsel moved (unsuccessfully) for a change of venue. But on February 11, counsel successfully obtained a continuance, and trial was rescheduled for July 6, 1998.[3] Mosier advised Henderson against requesting Judge Blackwood's recusal, explaining that he had no reason to ask for the judge's recusal and that there was no "better judge to hear a death penalty case," given that Judge Blackwood had stated "on the record that he was morally and philosophically opposed to the death penalty." R. 23-2, PID 2566-67.

---

[1] *See id.* PID 3359-61 (January 14, 1998 letter) ("By pleading guilty to such a charge [of first-degree murder] *with* the guarantee to the victim's family that I would *never* be eligible for parole (life without parole), is it possible to eliminate the other charges? Even if my punishment was several consecutive life sentences without the possibility of parole, I would still feel that a great deal was accomplished. . . . By bringing to the table a plea of guilty to the m[urder] charge . . . and asking to be given as many consecutive life sentences as the courts see fit, I am hoping that the d[eath] penalty would be lifted off my head and that the other nine charges can be dropped[.]"); *id.* PID 3373 (February 5, 1998 letter) ("As I told you, I feel very strongly about all of the following: (1) Entering a guilty plea[;] . . . (5) [v]arious charges eliminated in reference to my guilty plea[;] [lists several additional considerations].").

[2] Some of Henderson's letters mentioned his desire to plead guilty in conjunction with these other requests. For example, a fuller excerpt of his January 11, 1998 letter reads: "[b]y having to rush things before March 9th, there is much to miss out on because of the short time span, and after the trial, we would wish we would have thought of those pieces of reasoning. To be honest, I personally do not want to appear before a jury during trial. I wish so much to be able to only appear before the judge with a plea of guilt and of a plea for mercy and justice. But if you are able to move my trial to a different county, then I might have a change of opinion about certain things." R. 23-13, PID 3357. And Henderson's February 5, 1998 letter, along with including his "strong[]" feelings about entering a guilty plea and seeing "charges eliminated in reference to my guilty plea," also noted his strong desire to obtain a "change of judge and county" and a "much, much later court date (as far away from today as possible)." R. 23-13, PID 3373.

[3] Mosier's basis for the continuance motion, as discussed below, was that the mitigation specialist appointed by the court, Julie Fenyes, was "overwhelmed by the case load that she has" and "simply just hadn't been able to [properly prepare]"; he noted that "without a complete mitigation investigation, it's my opinion that I can't effectively give Mr. Henderson the sentencing hearing that is his right in this case." R. 20-2, PID 478-79. When the court asked Mosier what tasks Ms. Fenyes was planning on doing, which ones she completed, and which she had not completed, Mosier responded: "my answer to you would be, 'I don't know.' That's why Ms. Fenyes is appointed to do it. I don't know what they do." R. 20-2, PID 483. The court "reluctantly" granted the motion. *Id.* PID 484-85.

On the day of trial, July 6, 1998, Henderson submitted a written plea of guilty to all charges except the felony-murder charges, as well as written waivers of his right to trial by jury and his right to appeal his guilt, and the prosecution moved to dismiss the felony-murder charges. R. 20-2, PID 496-98. During a plea colloquy, Henderson acknowledged the penalties he could face for the crimes of which he admitted guilt, acknowledged that he understood the rights he was waiving, and stated that he was voluntarily waiving those rights. R. 20-2, PID 532-38. Judge Blackwell set the sentencing hearing for the following week, July 13, 1998, and Henderson waived his right to have a jury empaneled for sentencing. *Henderson*, 24 S.W.3d at 311.

### C. The Mitigation Investigation Leading Up to Sentencing

In the months leading up to July 1998, Mosier took a hands-off approach to the mitigation investigation, later testifying that he "relied upon the expert that the Court appointed to make . . . connections and tell me why" any leads were significant. R. 23-2, PID 2576-77. The defense team included a mental-health expert, psychologist Lynne Zager, a mitigation specialist, Julie Fenyes, and an investigator, Tammy Askew.

Dr. Zager conducted a three-hour forensic evaluation of Henderson in November 1997, during which she asked Henderson about his "social history"; and on January 7, 1998, she reviewed medical records from LeBonheur Children's Hospital, where Henderson was treated after being struck by a car while riding a bicycle when he was eleven or twelve years old. R. 23-3, PID 2318, 2321-22, 2330. On January 8, she advised trial counsel that Henderson was competent to stand trial and that she had no information to support an insanity defense or to diagnose a major mental illness. R. 23-3, PID 2332-33. She did no further work until July 8, the week before sentencing, when she administered the Minnesota Multi-Phasic Inventory, second edition (MMPI-2), a diagnostic test. R. 23-3, PID 2337; R. 20-5, PID 312-13. During this process,

Henderson described going into a dissociative state, lasting twenty-four hours, after firing the first shot. R. 20-5, PID 315. She ultimately diagnosed Henderson with a personality disorder with narcissistic and antisocial traits, but no other mental disorders, and determined that Henderson was not "substantially impaired" during the shooting. R. 20-5, PID 322-24, 333.

Fenyes's role was to compile a social background of Henderson and identify mitigating evidence. She joined the defense team in June 1997. Between June 1997 and March 1998, she did minimal work on Henderson's case, causing Mosier to request the continuance of the March 6, 1998, trial date. Then, before the rescheduled trial was set to start on July 6, Fenyes told Mosier that "all the mitigation evidence that she had chased down was not helpful, and she may have felt that perhaps she needed to do some more." R. 23-2, PID 2554. As a result, on the morning of the July 6 trial date—before Henderson pleaded guilty—Mosier requested a continuance, telling the court that: "Ms. Fenyes advises us that she is not satisfied with the stage at which her mitigation investigation is at" and had "chased down every lead that's been furnished" but "there hasn't been enough time." R. 20-3, PID 926.

Judge Blackwood then held an in-camera conference with Fenyes. Fenyes explained that she had interviewed "most family members that knew" Henderson but that they were "not as cooperative as I had hoped they would be," and that otherwise, she had not uncovered any mitigating evidence. R. 20-3, PID 942-43, 948. She also said that, as of July 6, "I have not yet met" the "minimum standard that I set for my own work." R. 20-3, PID 953. Judge Blackwood noted that Henderson's case may be one where there simply is no mitigating evidence:

> [Judge Blackwood]. Well, what concerns me: There are some people in the world, that regardless of what you do, you can't find anything that will mitigate what they've done.
>
> [Fenyes]. Certainly.

[Judge Blackwood]. And this may be one of the cases that there's absolutely
nothing that anyone can do[.]

R. 20-3, PID 953. In light of Fenyes's statement that she had not yet performed an adequate

mitigation investigation, Judge Blackwood granted a continuance of trial and suggested a new date

in August. R. 20-3, PID 956. Later that afternoon, however, Henderson pleaded guilty, accepted

a sentencing date of July 13, 1998, and waived a jury at sentencing. R. 20-3, PID 1012.

### D. Sentencing Hearing

At the sentencing hearing, the state presented a number of witnesses to support its argument

that the aggravating circumstances warranted imposition of the death penalty.[4] Defense counsel

presented only four witnesses in support of the mitigating factors: Henderson, Dr. Zager,

Henderson's mother, and Henderson's high-school principal.

Henderson testified that he had received various scholastic awards in elementary school

and was a varsity athlete and skilled artist in high school. R. 20-5, PID 253-59, 260-63. He

expressed remorse and apologized to Deputy Bishop's family, *id.* PID 264, and stated that he was

"still living in this dream. I mean, it still seems like it's a dream to me," *id.* PID 269. Henderson

also testified that while he was incarcerated in 1996, he asked his mother to get him psychological

help, but nothing came of it. *Id.* PID 267-68. On cross-examination, he acknowledged that he had

several prior convictions, stated that he was raised in a loving family environment, and, when

---

[4] *See Henderson*, 24 S.W.3d at 311 ("Several witnesses testified for the State at the sentencing hearing, including Deloice Guy, the inmate taken with the appellant to the dentist by Deputy Bishop; Dr. John Cima; Donna Feathers, Dr. Cima's dental assistant; and Peggy Riles, Dr. Cima's receptionist. In addition, Dr. O.C. Smith, a forensic pathologist, testified regarding his investigation of the crime scene and of his autopsy of Deputy Bishop. Dr. Smith stated that based on his examination of Deputy Bishop's wounds, along with witness testimony, it was likely that the first shot fired by the appellant hit the deputy in the neck, and caused the deputy to hit his head against the doorframe of the examination room. Dr. Smith opined that this blow to the deputy's head could have rendered him unconscious. Moreover, Dr. Smith testified that the second shot entered at the back of the deputy's head and exited near the left eye. This second shot caused "significant and severe brain damage," and the blood from this wound seeped from the skull fractures into the deputy's sinuses, and ultimately, was breathed into his windpipe. Finally, Dr. Smith testified that the bullets used by the appellant could have "easily" penetrated the thin walls of the dentist's office.").

asked if he ever "had any mental problems" requiring therapy or medication, answered: "I wouldn't say that." *Id.* PID 272-73, 281.

The next mitigation witness was Henderson's high-school principal, who generally described Henderson's high-school activities—playing basketball, being elected president of the student body, escorting the homecoming queen—and added that Henderson had mostly positive interactions with students but also had two undescribed "incidents"—which seemed to be fights— requiring the principal's involvement. R. 20-5, PID 287-90. Henderson's mother testified that Henderson "never" had problems with other students, and she never saw behavior from him during high school that suggested a need for intervention. R. 20-5, PID 292-93, 296. She recalled Henderson asking for psychological help while incarcerated in 1996 but never followed up on the request. *Id.* at PID 296. She testified that Henderson was raised in a "two-parent household" by "attentive parents, caring parents." R. 20-5, PID 298. When asked if she recognized any psychological problems with Henderson before Deputy Bishop's murder, she responded: "I wouldn't say that." *Id.* PID 299-300. But she added that he did a "couple things that didn't seem right . . . a couple of odd things," without specifying what they were. *Id.* She also testified that Henderson told her he did not remember the shooting. *Id.* PID 300-01.

The last mitigation witness was Dr. Zager. She testified that when she evaluated Henderson, he described being in a "dissociative state" for "about 24 hours after" the shooting, explaining that a dissociative state is "some sort of significant incident or trauma where an individual had difficulty integrating their overall functioning." R. 20-5, PID 314. She explained that she had diagnosed Henderson as having a "personality disorder, not otherwise specified, with" narcissistic and antisocial traits. *Id.* PID 317-18. As to Henderson's mental state at the time of the shooting, she opined that he was "under duress" and that "his judgment was not adequate," but

added that he was "not substantially impaired" and that she "would not offer an opinion to the Court that he be considered insane at the time." R. 20-5, PID 321-22. On cross-examination, she agreed that her diagnosis was a "basic catchall for something you can't otherwise explain." *Id.* PID 323-24. When asked, she agreed that Henderson did "not have a prior mental health history[,] [t]hat's absolutely correct." *Id.* PID 328.

At a few points, Dr. Zager mentioned that she reviewed records of the head injury Henderson suffered as a child, but offered sparse elaboration on what significance, if any, that information had. *See, e.g.*, R. 20-5, PID 311 ("I recall, also [when meeting with Henderson], he reported having had a significant head injury, where he had to be hospitalized, and I knew that it was very important to get those and other medical records, school records, et cetera, to do a comprehensive evaluation. At that time my initial impression was I would recommend he be considered competent to stand trial. And in terms of the mental condition at the time, I didn't have information at that time that I would have offered an opinion that he had a defense."); *id.* PID 329 (Dr. Zager noting that she "reviewed the records from his head injury and other records," without otherwise discussing the head injury). In discussing Henderson's social background, Dr. Zager noted that Henderson:

> had a lot going for him . . . he had a good family; he had a two-parent family; he had a loving family. He describes hi[s] family as being the most wonderful family in the world. Given all of that, though, there were problems and they weren't recognized and they weren't dealt with. And even in the most loving families and in the best circumstances, we all know there can be problems and they're not dealt with, and that's one of the areas that is of concern for me.

R. 20-5, PID 332. She added—without specificity—that it would be "significant" that Henderson "may have had problems in his life," but that it would not be significant to her evaluation of whether he was competent to stand trial. R. 20-5, PID 333. On that question, she stated that her

view was that Henderson was competent and that there was "no question" that he was sane at the time of the murder. R. 20-5, PID 333. After Dr. Zager's testimony, the defense rested.

The state argued that five aggravating factors called for the death penalty: (1) Henderson created a great risk of death to two or more persons during the act of murder, Tenn. Code Ann. § 39-13-204(i)(3); (2) the murder was committed for the purpose of avoiding an arrest, *id.* § 39-13-204(i)(6); (3) the murder was committed while fleeing after committing robbery and kidnapping, *id.* § 39-13-204(i)(7); (4) the murder was committed during an escape from lawful custody, *id.* § 39-13-204(i)(8); and (5) the murder was committed against a law-enforcement officer engaged in the performance of official duties, *id.* at § 39-13-204(i)(9). R. 20-5, PID 338-40. The state also highlighted the lack of evidence from the defense team supporting mitigation. R. 20-5, PID 341.

Defense counsel argued for five mitigating factors: that Henderson (1) had no significant history of prior criminal activity, Tenn. Code. Ann. § 39-13-204(j)(1); (2) committed the murder under extreme mental or emotional disturbance, *id.* § 39-13-204(j)(2); (3) acted under extreme duress, *id.* § 39-13-204(j)(6); (4) committed the murder while his mental capacity, while not deficient to the point of raising a defense, was substantially impaired, *id.* § 39-13-204(j)(8); and (5) was of a youthful age when committing the offense, *id.* § 39-13-204(j)(7). R. 20-5, PID 341-44. Counsel also argued for a non-statutory mitigating factor: that Henderson was a "young man who had a lot going for him" but "something happened and brought us where we are today," and the "lack of any intervention" to identify Henderson's "disorders" should be considered. R. 20-5, PID 344-46. Counsel offered almost no specifics in support of this argument, instead concluding with: "[y]ou know, some things speak for themselves, and sometimes things that a person does

are so terrible, so horrible, and so inhumane that they can't have been committed by somebody who didn't have a mental defect. And I think that this is a classic example." *Id.* PID 346.

Judge Blackwood determined that the aggravating factors outweighed the mitigating factors, and sentenced Henderson to death. R. 20-5, PID 356. Henderson appealed, arguing that the death penalty was excessive and disproportionate, and the Tennessee Court of Criminal Appeals affirmed. *Henderson*, 24 S.W.3d at 213. Upon automatic review, the Tennessee Supreme Court affirmed as well. *Id.* at 310-19.

### E. State-Court Post-Conviction Proceedings

### 1. Lead-Up to Post-Conviction Hearing

Henderson filed a pro se petition for post-conviction relief in February 2001 and an amended, counseled petition in November 2001. The amended petition asserted ineffective assistance of counsel at trial and sentencing, along with several other challenges. Among other things, the petition alleged that trial counsel ineffectively advised Henderson to plead guilty and conducted an inadequate mitigation investigation, including the investigation into Henderson's mental illness. The petition did not mention anything about brain damage or failure to investigate Henderson's head injury.

Henderson's post-conviction counsel were Donald Dawson and Catherine Brockenborough from the Tennessee Office of the Post-Conviction Defender. Between November 2001 and January 2003, Dawson and Brockenborough requested several continuances of the post-conviction hearing. This eventually caused Judge Blackwood to remove them from the case for

failure to diligently prepare, before later rescinding his order.[5]  The hearing was eventually set for April 28, 2003.

## 2.  The Post-Conviction Hearing

At the post-conviction hearing, counsel focused largely on establishing that trial counsel performed an ineffective mitigation investigation and that an effective investigation would have led to evidence showing that Henderson had a mental illness.  Specifically, post-conviction counsel

---

[5] After the state answered Henderson's amended petition, an evidentiary hearing was set for April 4, 2002. Defense counsel filed a motion to continue in March 2002, explaining that the mitigation was complicated, that the defense experts had not yet completed their work, and that Brockenborough was in the midst of an "acute" relapse for an unspecified "chronic condition," was under doctor's orders to reduce stressful situations in her life, and was thus unable to work on Henderson's case.  R. 21-15, PID 1198-99, 1207-08.  Judge Blackwood granted the continuance and set the hearing for August 12, 2002.  R. 21-15, PID 1212.  On July 5, 2002, counsel moved to continue this date.. They stated that their investigator, Kathryn Pryce, was undergoing dental surgery in July and that Dawson—lead counsel—had suffered a severe lower-back injury requiring surgery in late June, and was dealing with debilitating sciatica, preventing him from doing almost any work other than for extremely limited periods.  R. 21-15, PID 1215. Counsel also noted that another of Dawson's cases had received an execution date, creating unexpected major additional work.  *Id.*  PID 1215-18.  Judge Blackwood denied the motion, R. 21-15, PID 1238, but after counsel filed a motion to reconsider—pointing out that the chief judge had not yet approved expenditure of approved funds for Henderson's experts—Judge Blackwood "[r]eluctantly" granted a continuance until December 16, 2002, warning that "[t]here will be no further continuance."  R. 22-1, PID 1528.  On November 2, 2002, defense counsel requested continuance of the December hearing, stating that their psychiatric expert, Dr. William Kenner, believed that Henderson suffered from Bipolar II disorder but needed to place Henderson on mood-stabilizing medication for three to four months to determine his diagnosis.  R. 22-1, PID 1542-43.  On December 6, 2002, Judge Blackwood issued an order granting the continuance and removing Dawson and Brockenborough from representing Henderson:

> [A] pattern has emerged by Petitioner's counsel to apply for continuances shortly before each evidentiary hearing is scheduled.  Included among the numerous reasons given for counsel's inability to be prepared for the hearing were the limited resources of their office, other workload, inability to investigate, conflicts with other cases, health problems and inability of their experts to complete their work.  The Court finds that counsel has not been diligent in preparing this case for trial and has no expectation that counsel will be ready for a hearing at the next scheduled date.  For the foregoing . . ., the Court hereby relieves the Office of the Post-Conviction Defender of any further responsibilities in this matter[.]"

R. 22-1, PID 1546.  Dawson and Brockenborough filed a motion to reconsider on December 30, attaching an affidavit from Henderson stating that he believed that they had been "diligently working on my case," that their team "interviews me on a regular basis attempting to gather additional information," and has "interviewed the members of my family and others. . . . I am fully satisfied with their work[.]"  R. 22-3, PID 1603-04.  On January 2, 2003, Judge Blackwood granted the motion and reinstated counsel.  *See* R. 22-6, PID 1605 ("The Court anticipates any further hearing and ruling [on the motion to reconsider] will only delay the disposition of this matter.  Secondly, the Court is not eager to hear why there have been so many delays in this case and the excuses for them.  Consequently, the Court will reverse its last ruling.").

emphasized that trial counsel failed to discover (1) a series of "red-flag" crimes and bizarre criminal behavior after high school and (2) a family history of mental illness.

Examples of the red-flag crimes included that Henderson burglarized the home of his high-school art teacher and family friend, cutting her phone line and holding a towel over her face while she slept, stealing her checkbook, and later getting caught trying to write checks in her name; Henderson abducted the fifteen-year-old sister of an ex-girlfriend and held her for two days; starting in February 1995, Henderson abducted and raped S.C., the mother of his then-girlfriend, on several occasions and after one occasion put out a false public announcement in a newspaper that he and the daughter had gotten married.[6] Mosier testified that at the time of sentencing, he was unaware of the abductions of S.C., despite the fact that the state had sent him and co-counsel information about the abductions in discovery. When asked if it would have meant something to him, Mosier responded: "[i]t wouldn't have suggested anything to me." R. 23-2, PID 2580.

Post-conviction counsel also sought to establish that members on both sides of Henderson's family had a history of mental illness (information that mitigation trial counsel had not uncovered). They introduced medical records for several of Henderson's maternal cousins, aunts, and uncles who had been treated at mental-health facilities, as well as psychiatric records of Henderson's paternal grandmother, who was institutionalized at Methodist Hospital in Memphis. Family

---

[6] During one of the abductions of S.C., in February 1996, Henderson took S.C. from her home at gunpoint and drove around with her for a day and a half in his car, forcing her to use the backseat as a bathroom. According to a police report read into the record, S.C. described Henderson's decision to release her, in part, as follows: "When he decided to let me go, he said, 'Don't tell anyone.' He said he'd seen a person who got killed and that it messed up his mind. He must have thought that I was crazy that I wouldn't tell anyone. Then he said he was thinking about driving the car off in the river with him and me in it, and he'd drive to the river and shoot himself in the head or that he would drive to the river and shoot myself in the head. Then he told me to take the thing off my head. He was trying to figure out what he'd do. He thought that if he let me see him that I wouldn't tell anyone what he'd done. I could tell he didn't know what he was going to do. I think that he was really scared before he let me go. We went to McDonald's, and kidnapping someone with them on the floorboard, that's crazy. I was in the floor of his car in the front seat." R. 23-4, PID 3257. Henderson eventually let S.C. go.

members from Henderson's maternal and paternal sides testified about the history of mental illness in his family.

Dr. William Kenner, a psychiatrist, testified that based on the information discussed above and his own in-person evaluations, he had diagnosed Henderson with Bipolar II disorder. R. 23-4, PID 3233-34. Another mental-health expert—psychologist Dr. Pamela Auble—gave Henderson a battery of psychological tests and reached the same conclusions as Dr. Zager, i.e., that Henderson "does not have what I would call global or general deficits, but does have some specific problems in his mental abilities." R. 23-4, PID 3210. Dr. Frank Einstein, a mitigation specialist, analyzed Julie Fenyes's mitigation work and testified that it fell far below the standards for an adequate investigation. He reviewed her billing sheets and determined that she did "almost all [her] work" within "the three weeks preceding the [sentencing] hearing itself," and that "very little work" was done before then. R. 23-2, PID 2626-27.

Several witnesses—Drs. Einstein, Zager, and Auble—made brief references to their awareness of records from Henderson's stay at a children's hospital after being struck by a car as a child, R. 23-2, PID 2658 (Dr. Einstein); R. 23-3, PID 2330, 2353 (Dr. Zager); R. 23-4, PID 3209, 3223 (Dr. Auble), but none elaborated on what those records showed.[7]

---

[7] Dr. Einstein explained that "one of the very first things a mitigation specialist looks at is whether there was some sort of trauma to the defendant," and when asked if he was able to "determine any significant physical trauma that may have had any impact on this case," he responded that "[t]here were two medical incidents. In one case I think he was hit by a car and had a possible head injury which was diagnosed as a possible concussion. The second was an incident, which I still don't completely understand, in which he lost – he fell down some stairs and lost control of his ability to move his legs for a period of time." R. 23-2, PID 2658-59. Dr. Zager testified that she reviewed the hospital records of the bike accident but was not qualified to make a determination whether the injury was significant because she was a psychologist, not a medical doctor. *See* R. 23-3, PID 2354 (Dr. Zager answering question whether Henderson had any significant medical conditions with: "Qualifying the answer to that question that I'm not a medical doctor, I'm a psychologist, there were some injuries in the past that he had sustained that I reviewed records, particularly since one had been a head injury. . . . But to the best of my knowledge, at the time I made the diagnosis he was healthy. . . . I believe he was on a bike and hit by a car."). Dr. Auble simply stated that in reviewing Dr. Zager's work, she also reviewed the hospital records. R. 23-4, PID 3209, 3223.

Additionally, Mosier addressed Henderson's decision to waive a jury for sentencing. He testified that he "didn't advise [Henderson], yes or no, to do it," but "advised him of the consequences" and "what the advantages were and the disadvantages were." R. 23-2, PID 2567. When asked what advice he gave, Mosier responded:

> this case was even more difficult [than some death-penalty cases] because it involved an apparently senseless killing of a law-enforcement officer. I didn't feel like Mr. Henderson's chances before a jury in any county were good at all. I felt like that allowing Judge Blackwood to sentence him in this case gave him the best chance that he had to avoid the death penalty.

R. 23-2, PID 2567–68. Mosier acknowledged that at the time he was advising Henderson on whether to plead guilty, Fenyes had not turned up anything that would be helpful to Henderson at the penalty phase of the proceeding, but he hoped that Henderson's acceptance of responsibility would "tip the scales" at sentencing:

> Every lead that Ms. Fenyes pursued turned up things that would not be helpful to Mr. Henderson. I felt like that all there was left for him was to try to demonstrate to the judge his acceptance of responsibility and by putting him on the stand, let him show remorse for what he did.

R. 23-2, PID 2570. Mosier also noted that as the trial date approached, Dr. Zager had only offered "pretty thin" mental-health mitigation evidence for sentencing. *Id.* PID 2571-72. Mosier added that at that point, he believed that Henderson was "very bright" and "wasn't lacking in mental capacity." *Id.*

### 3. State-Court Resolution of Post-Conviction Petition

Post-conviction counsel submitted a "closing argument" in the form of a written brief. Henderson's mental health as discussed above was one of its central arguments. *See, e.g.*, R. 22-8, PID 1920, 1930. Brain damage was not part of this argument. Judge Blackwood denied relief in a five-page written order. R. 22-8, PID 1943-47. He concluded that trial counsel was not ineffective despite being unaware of "all the history of mental illness in the Petitioner's family" or

"some of the violent events that the Petitioner engaged in shortly before this incident." R. 22-8, PID 1945. He also stated that the newly presented mitigation evidence was a "double-edged sword" and would not have changed Henderson's sentence, adding that "the Court, having been the trier of fact during the punishment phase, is in a unique position to be able to hear any additional mitigating evidence and weigh it against the evidence heard at trial":

> The Court can now look to the additional mitigation proof offered at this hearing in assessing whether the result would have been different. The additional mitigation proof can be summarized. The Petitioner was a normal student in grammar and high school. He was a talented basketball player and had a talent for art. About two years prior to this event, his behavior changed. He became violent. He viciously assaulted one girlfriend. He was convicted of some lesser felonies. Thereafter, he abducted the mother of his girlfriend on several occasions while masked. He also raped the mother. Petitioner's clinical psychologist opined that he had a personality disorder, but did not basically disagree with trial counsel's clinical psychologist, other than she administered more tests. Finally, Dr. Kenner diagnosed the Petitioner as bipolar. Significantly, Dr. Kenner opined that in order to fully explain the nature of Petitioner's bipolar diagnosis, the trier of fact would have to hear all the details of Petitioner's various assaults, abductions and rapes.
>
> At trial, the statutory aggravating circumstances . . . were simply overwhelming. The Court considered the mitigating testimony, especially the testimony regarding this personality disorder. This proffered new mitigating testimony regarding Dr. Kenner's bipolar diagnosis[] only reinforces the Court's opinion that the aggravating circumstances outweighed, in fact overwhelmed, any mitigating evidence. Two additional points need to be made. The Court is assuming, for arguments' purpose, that Dr. Kenner's diagnosis is correct. . . . Secondly, the evidence presented regarding the defendant's abduction of his girlfriend's mother, the rapes, the assaults, lead the Court to the conclusion that the Petitioner's acts were calculated, cold and deliberate. These are the same calculated and deliberate actions that led to the death of Tommy Bishop. Whether or not they are a result of a bipolar condition would not have changed the Court's decision to impose a sentence of death.

R. 22-8, PID 1944-47. Henderson appealed, and his appellate brief raised the same mental-health-related arguments, among others. *See*, *e.g.*, R. 23-15, PID 3163-68.

The Tennessee Court of Criminal Appeals (CCA) affirmed. *Henderson v. State*, 2005 WL 1541855 (Tenn. Crim. App. June 28, 2005). The CCA provided a detailed summary of the

testimony at the post-conviction hearing, including the new evidence of red-flag crimes and family history of mental illness, as well as Dr. Kenner's bipolar diagnosis. The CCA rejected Henderson's ineffective mitigation-investigation argument, reasoning that he could not establish prejudice given Judge Blackwood's accurate double-edged-sword observation and his statement that the newly discovered evidence and bipolar diagnosis would not have changed his sentence.[8] The CCA also rejected the argument that counsel was ineffective for advising Henderson to plead guilty and waive jury sentencing because

> [t]he evidence against the petitioner was overwhelming, as was the evidence of the statutory aggravating factors. Moreover, it is clear from the colloquy at the guilty plea hearing that the petitioner was informed that the trial court could impose a sentence of life, life without parole, or death. Thus, the petitioner made a conscious decision between two (2) viable options. Without more, the petitioner has failed to prove that counsel's advice was completely unreasonable. He is not entitled to relief on this issue.

*Id.* at *36-39. The Tennessee Supreme Court denied Henderson's application for permission to appeal.

---

[8] The CCA explained:

It appears that the crux of the petitioner's complaint is the failure to introduce evidence regarding the alleged existence of a bipolar type 2 mental illness. The existence of such a mental illness would have been apparent, suggests the petitioner, had trial counsel discovered a family history of mental illness and evidence of the petitioner's erratic criminal behavior. . . . This "undiscovered" mitigation evidence raised by the petitioner was correctly characterized by the post-conviction court as being a "double-edged sword." Given the strength of the proof of the aggravating circumstances relied upon by the State, the mitigation evidence that was presented at sentencing and the possible negative impact of the "undiscovered" mitigation evidence, we conclude that had this information been presented to the court there is little reason to believe the trial judge would impose a sentence other than death. The petitioner is not entitled to relief on this basis. Indeed, in this case, unlike the situation where a jury imposes a death sentence, we are not left to speculate to some degree as to the effect this evidence might have had on the sentencer. The sentencer in this case, the trial judge himself, found this evidence would not have altered the result of the sentencing hearing.

*See id.* at *42-43.

## F. Federal Habeas Proceedings

Henderson filed a timely pro se federal habeas petition under 28 U.S.C. § 2254, then filed an amended, counseled petition. The amended petition raised a large number of claims, set off in different paragraphs of the petition. Paragraph 13 alleges that Henderson was incompetent to enter a guilty plea and waive jury sentencing. R. 16, PID 126. Paragraph 8 consists of thirteen sub-claims (8(a) through 8(m)) asserting various theories of ineffective assistance of trial counsel, *id.* PID 86-94, including ineffective assistance in advising Henderson to plead guilty (Claim 8(h)), *id.* PID 92. Paragraph 9 consists of twenty sub-claims (9(a) through 9(t)) asserting various theories of ineffective assistance of counsel at sentencing. *Id.* PID 94-114. Claim 9(a) alleges ineffectiveness for advising Henderson to waive jury sentencing. Claim 9(d)(4) asserts that counsel was ineffective in failing to discover and present evidence that Henderson "suffers from brain damage." *Id.* PID 103. Finally, Claim 9(n) states: "[c]ounsel did not interview and adequately prepare defense witnesses, resulting in the failure to present to the Court a complete picture of Kennath Henderson." *Id.* PID 108. Claim 9(n) is phrased identically to a claim raised in the state-court post-conviction petition. *See* R. 21-14, PID 1146 (Ground 2.9).

The warden moved for summary judgment, and Henderson filed a response brief that attached an expert report from Dr. Ruben C. Gur—a Professor of Neuropsychology at the University of Pennsylvania—who reviewed imaging of Henderson's brain and determined that Henderson suffered from brain damage that likely stemmed in part from his childhood bike accident. (Gur Report) R. 68-1, PID 3991-94. Dr. Gur concluded that Henderson's "cranial volume is more than 2 standard deviations . . . below normal, a condition that occurs in less tha[n] 2.5% of the population," and that Henderson had "abnormally low brain volume" overall, a "sign of neurodevelopmental abnormalities." *Id.* PID 3993. Dr. Gur noted that Henderson's cranial

volume reduction was more significant in the left-top area of his head—the same spot where, as a child, he complained of soreness after his bicycle accident—and noted that the scans showed reductions consistent with "atrophy . . . often seen following head injury." *Id.* Based on a clinical interview and computerized testing—conducted in conjunction with a review of the brain scans—Dr. Gur concluded "to a reasonable degree of scientific certainty" that Henderson "suffers from brain dysfunction" and "abnormalities in brain function in regions relevant to behavior, especially related to executive functions (frontal), attention and comprehension of complex information (parietal), and the integration of self (right parietal)."[9] *Id.* PID 3993-94. He concluded that these abnormalities were "most likely related to anoxia or traumatic brain injury," and indicate that Henderson "suffers from brain dysfunction that impairs his ability to modulate his behavior in accordance with context and may specifically lead to dissociative states, such as the state he was in when he committed the offenses." *Id.* PID 3994.

Henderson also attached a report from Dr. George Woods, a psychiatrist, who diagnosed Henderson with Bipolar I disorder. (Woods Report) R. 55; R. 68-2, PID 3995-4007. After explaining how he reached a Bipolar I diagnosis, Dr. Woods noted:

> Importantly, Mr. Henderson's cognitive deficits are not only a function of his Mixed Phase Bipolar disorder. Dr. Ruben Gur, PhD., also documented structural damage in Mr. Henderson's brain. Specifically, Mr. Henderson shows impairments in the parts of his brain that control the ability to effectively weigh and deliberate and to control the understanding of social cues and recognize social responses. . . .
>
> The synergy between an impaired brain and a genetically-derived mood disorder creates for Mr. Henderson an increased vulnerability to atypical and more severe

---

[9] Dr. Gur elaborated that the frontal lobes "involve the ability to control and regulate behavior in accordance with its context, especially the ability to weigh and deliberate in making decisions." *Id.* The parietal lobes "are directly related to spatial processing and sensory integration and comprehension," including "integration of personality." *Id.* Damage to these areas of the brain "thus contributes to a poor recognition of social consequences and social cues, and is often related to dissociation." *Id.* According to Dr. Gur, other regions of Henderson's brain—like the temporal and occipital lobes—"[had] normal and even high relative volumes." *Id.*

symptoms than would be expected from either the impaired brain or the Bipolar I Disorder individually.

R. 68-2, PID 4004. Dr. Woods concluded:

These mental disorders, synergistic in their effects, including Mr. Henderson's depression, social decompensation, impaired ability to effectively weigh and deliberate due to his brain deficits, and impaired judgment, precluded Mr. Henderson from conforming his behavior to the law and also from making a rational and voluntary, intelligent, and knowing waiver of his rights to a jury trial and waiver of his right to be sentenced by a jury.

*Id.* PID 4007-08.

The district court denied Henderson's habeas petition in two orders. It held that Henderson's claims of ineffective assistance for advising him to plead guilty and waive jury sentencing were decided in state court on the merits and the decisions were neither "contrary to or an unreasonable application of clearly established federal law or based on an unreasonable determination of facts." R. 72, PID 4144, 4091; R. 91, PID 4422. It reached the same conclusion regarding Henderson's brain-damage claim, Claim 9(d)(4), reasoning that since it was decided on the merits, consideration of the Gur Report was barred under *Cullen v. Pinholster*, 563 U.S. 170 (2011). R. 72, PID 4127; R. 91, PID 4445-48.[10] The district court concluded that Claim 9(n) was procedurally defaulted and that Henderson could not establish "cause" to excuse the default. R. 72, PID 4129-30. It held the same for Henderson's incompetency claim (Claim 13). R. 72, PID 4181-82.

---

[10] In deciding that Claim 9(d)(4) was decided on the merits, the district court failed to cite any page of any state-court decision purporting to decide a claim relating to failure to present brain-damage evidence. The court concluded—without clear explanation—that Henderson "exhausted" claim 9(d)(4) despite also recognizing that "Henderson did not specifically assert that he suffered brain damage in the post-conviction proceedings." R. 72, PID 4126; *see also* R. 91, PID 4446-47 (concluding that the "Tennessee Court of Criminal Appeals' decision that Henderson was not prejudiced by counsel's failure to further investigate the accident and possible brain damage is not unreasonable," but failing to cite any page of the CCA's opinion purporting to reach that conclusion). It appears that the court may have distinguished between raising the claim and providing evidence in support of the claim, and possibly concluded that because there was some testimony that mentioned the bicycle accident, although no mention of brain damage, the brain-damage claim was exhausted.

Henderson appealed, but we remanded for reconsideration in light of *Martinez v. Ryan*, 566 U.S. 1 (2012), which recognized that under certain circumstances, ineffectiveness of post-conviction counsel may excuse procedurally defaulted "substantial" claims of ineffective assistance of trial counsel. The district court ordered Henderson to identify any defaulted "substantial" claims to which *Martinez* might apply. R. 123, PID 4621-22. Henderson responded, identifying numerous claims, including Claim 9(d)(4) and Claim 9(n). R. 129, PID 4668, 4660-67.[11] The brief focused on Claim 9(n), largely raising the same types of arguments in support of the claim—failure to identify red-flag crimes and mental illness—that were raised in the state-court post-conviction proceedings.[12] The district court held, once more, that claim 9(d)(4) was decided on the merits, and that *Martinez* would not allow Henderson to "circumvent *Pinholster*" and present the Gur Report in support of the claim. R. 134, PID 5019. It also denied relief on Claim 9(n), reasoning that although the claim—in the district court's view—was procedurally defaulted, it was not "substantial" under *Martinez*.

The district court issued a certificate of appealability (COA) on Henderson's claim that trial counsel was ineffective at sentencing (Claim 9) and his claim that he was incompetent to enter a guilty plea and waive jury sentencing (Claim 13). Henderson appealed, and we expanded the

---

[11] During the first round of summary-judgment briefing, before *Martinez*, Henderson had submitted declarations from post-conviction counsel Dawson, and several members of Dawson's office, stating that post-conviction counsel Brockenborough was suffering from severe mental illness during her representation of Henderson and was unable to function professionally or personally. *See* R. 74-1, 74-2, 74-3. In his post-remand briefing, Henderson signaled that he would rely on this type of information to show that post-conviction counsel was ineffective, and sought an evidentiary hearing to do so. R. 129, PID 4647.

[12] Henderson's brief on remand attached several new declarations relating to the fact that Henderson's father, Elton Henderson, suffered from mental illness. *See* R. 129-6 to 129-13. It also included a 2011 declaration from Judge Blackwood stating that he believed that trial and post-conviction counsel were ineffective, but also stating that he had reviewed the Gur and Woods reports and, after "several days [of] reflection on this matter," concluded he would still have imposed the death penalty even if he knew of those reports at the time. R. 129-2, PID 4690. Earlier in the federal habeas litigation, in 2008, Judge Blackwood had provided a declaration to federal habeas counsel—before seeing any new brain-damage evidence—stating that during sentencing, he would have been open to considering brain-damage evidence or evidence of mental illness, but not expressing any conclusions on whether it would have changed Henderson's sentence. R. 68-3, PID 4010-12.

COA to also include Henderson's claims that trial counsel was ineffective during the guilt phase for advising Henderson to plead guilty (Claim 8(h)) and for failing to use expert services effectively (Claim 8(k)).

## II. STANDARD OF REVIEW

On appeal from a § 2254 proceeding, we review a district court's legal conclusions de novo. *Moss v. Hofbauer*, 286 F.3d 851, 858 (6th Cir. 2002). The Antiterrorism and Effective Death Penalty Act (AEDPA) provides that for claims "adjudicated on the merits in State court proceedings," we may only grant relief if the decision "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A determination is "contrary to" clearly established federal law if the "state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts." *Van Tran v. Colson*, 764 F.3d 594, 604 (6th Cir. 2014). A determination involves an "unreasonable application" of federal law if the "state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case." *Henley v. Bell*, 487 F.3d 379, 384 (6th Cir. 2007). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181.

### III. DISCUSSION

The claims before us present four issues: (1) whether trial counsel were ineffective in advising Henderson to plead guilty and waive jury sentencing (Claims 8(h) & 9(a)); (2) whether Henderson was competent to plead guilty and waive jury sentencing (Claim 13); (3) whether trial counsel were ineffective at sentencing (Claim 9); and (4) whether trial counsel were ineffective in their use of expert services in preparing for the guilt phase (Claim 8(k)). Henderson does not brief the fourth issue on appeal, so we deem it forfeited. *Landrum v. Mitchell*, 625 F.3d 905, 913 (6th Cir. 2010).

### A. Guilty Plea and Jury Waiver (Claims 8(h), 9(a))

Henderson first argues that trial counsel were constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984) for advising him to plead guilty and to waive jury sentencing. It is undisputed that the state court rejected these claims on the merits, so Henderson must satisfy § 2254(d)'s standards by showing that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

### 1. The Guilty-Plea Claim

Under *Strickland*, a petitioner must show that (1) counsel's performance was ineffective and (2) he suffered prejudice as a result. 466 U.S. at 692. Counsel's performance is ineffective when it falls below "an objective standard of reasonableness." *Id.* at 687-88. In general, *Strickland*'s prejudice standard requires "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. But in the context of guilty pleas, the question is whether "there is a reasonable probability that, but for counsel's errors, [petitioner] would not have pleaded guilty and would have insisted on going to

trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). "When analyzing a *Strickland* claim under § 2254(d), our review is 'doubly deferential.'" *Campbell v. Bradshaw*, 674 F.3d 578, 587 (6th Cir. 2012) (quoting *Pinholster*, 563 U.S. at 190)).

Henderson first argues that the state court applied a standard "contrary to" *Strickland* and *Lockhart* when assessing counsel's effectiveness. Specifically, Henderson takes issue with the CCA's reliance on a Tenth Circuit decision, *Hatch*, in articulating the applicable standard for the "performance" prong of *Strickland*. The CCA stated:

> An attorney's advice to his client to waive the client's right to a trial by jury is a classic example of a strategic trial judgment, "the type of act for which *Strickland* requires that judicial scrutiny be highly deferential." *Hatch v. Oklahoma*, 58 F.3d 1447, 1459 (10th Cir. 1995) (quoting *Green v. Lynaugh*, 868 F.2d 176, 178 (5th Cir.), *cert. denied*, 493 U.S. 831, 110 S. Ct. 102, 107 L.Ed.2d 66 (1989) (per curiam). It constitutes a conscious, tactical choice between two viable alternatives. *Hatch*, 58 F.3d at 1459 (citing *Carter v. Holt*, 817 F.2d 699, 701 (11th Cir. 1987)); *United States v. Ortiz Oliveras*, 717 F.2d 1, 3 (1st Cir. 1983) (holding that tactical decisions, whether wise or unwise, successful or unsuccessful, cannot ordinarily form the basis of a claim of ineffective assistance of counsel). Thus, for counsel's advice to rise to the level of constitutional ineffectiveness, the decision to waive a jury must have been "completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy." *Hatch*, 58 F.3d at 1459.

*Henderson*, 2005 WL 1541855, at *36. Henderson argues that the CCA "[v]itiat[ed]" the standard set by the Supreme Court by relying on *Hatch* and asking whether counsel's advice was "completely unreasonable" and "bears no relationship to a possible defense strategy." Appellant. Br. at 56-57.

As the warden points out, however, we have favorably cited an almost-identical articulation of the *Strickland* standard—albeit in a decision post-dating the state-court decision here. *See Moore v. Mitchell*, 708 F.3d 760, 786 (6th Cir. 2013) (describing the performance prong as requiring that counsel's action "must have been completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy" (quoting *Hoxsie v. Kerby*, 108 F.3d

1239, 1246 (10th Cir. 1997)). At the very least, this statement in *Moore* shows that the CCA's articulation of the *Strickland* standard was not necessarily a misstatement of the law, and certainly was not clearly "contrary to" *Strickland* as required by § 2254(d)(1).

Next, Henderson argues that the CCA violated § 2254(d)(1)'s "contrary to" clause in discussing prejudice. According to Henderson, the CCA incorrectly applied "an outcome determinative test" to determine prejudice. Henderson reasons, based on the CCA's observation that the evidence of Henderson's guilt was overwhelming, that it applied a "prejudice test [that] would require Mr. Henderson to prove he would have prevailed had he gone to trial"—a test contrary to *Lockhart*, which only requires a reasonable probability that the defendant would not have pleaded guilty. Appellant Br. at 58-59. This is an inaccurate characterization. The CCA did not require proof that Henderson would have won at trial but for the advice to plead guilty. Rather, it correctly articulated the *Lockhart* prejudice standard. *See Henderson*, 2005 WL 1541855 at *31 ("[I]n the context of a guilty plea, to satisfy the second prong of *Strickland*, the petitioner must show that 'there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" (quoting *Lockhart*, 474 U.S. at 59)); *id.* at *36 (same). The CCA correctly applied this standard as well. *See id.* at *37 (noting that Henderson sent several letters stating his desire to plead guilty and submit his case to a judge rather than a jury, and that Henderson "did not testify at the post-conviction evidentiary hearing, so there is no direct evidence in this record that but for counsel's alleged deficiencies he would not have pled guilty or submitted his case to the trial judge for sentencing"). Further, the CCA's recognition of the overwhelming evidence of guilt—which Henderson quotes out of context—was made when discussing effectiveness, not prejudice. The CCA cited the overwhelming evidence of guilt as a reason why it may have been reasonable to recommend a guilty plea. *Id.* at *37-39.

Finally, Henderson argues that the CCA's decision was based on an unreasonable determination of the facts. Under § 2254(d)(2), "state-court factual determinations must stand unless they are objectively unreasonable in light of the evidence presented in state court." *Allen v. Mitchell*, 953 F.3d 858, 864 (6th Cir. 2020). Henderson challenges the following portion of the CCA opinion:

> The record indicates that trial counsel made no guarantee to the petitioner that the trial court would not impose a death sentence. The evidence against the petitioner was overwhelming, as was the evidence of the statutory aggravating factors. Moreover, it is clear from the colloquy at the guilty plea hearing that the petitioner was informed that the trial court could impose a sentence of life, life without parole, or death. Thus, the petitioner made a conscious decision between two (2) viable options. Without more, the petitioner has failed to prove that counsel's advice was completely unreasonable.

*Henderson*, 2005 WL 1541855 at *39. Henderson argues that it was an "unreasonable determination of the facts for the CCA to conclude that Mr. Henderson made a conscious decision between two 'viable' options" because, in light of the absence of mitigation evidence when Henderson pleaded guilty, Tennessee law would have required Judge Blackwood to impose a death sentence. Appellant Br. at 62. But the same situation would have existed had Henderson not pleaded guilty—the same overwhelming evidence of guilt and aggravating factors would have been present, as would the same lack of mitigating evidence. Henderson argues that the law *required* the judge to impose a death penalty based on the absence of mitigating evidence, but if so, he fails to explain why it would not have also directed a jury to do the same. Tennessee law is the same whether a jury or judge imposes the sentence.

More fundamentally, Henderson fails to identify a faulty *factual determination* in this portion of the CCA's reasoning, let alone one that was the basis of the CCA's decision. But that is what § 2254(d)(2) requires. *See Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011) ("With regard to [§ 2254(d)(2)], it is not enough for the petitioner to show some unreasonable determination of

fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination."). Henderson does not dispute the CCA's factual determinations that (i) the record showed that trial counsel made no guarantees regarding the death penalty; (ii) the evidence of guilt and statutory aggravating factors was overwhelming; and (iii) the plea colloquy informed Henderson of the risks of pleading guilty. All these determinations are supported by the record.

### 2. The Jury-Waiver Claim

Henderson makes no specific argument regarding the jury-waiver claim; indeed, he combines the two claims and raises the same set of arguments for both.[13] We note that to the extent there is a question whether *Strickland* or *Lockhart* governs the prejudice inquiry in claims of ineffective advice to waive jury sentencing, it does not matter because Henderson's challenge fails under either standard for the reasons discussed above.

### B. The Competency Claim

Henderson next argues that he was not competent to plead guilty or waive jury sentencing. The warden responds that Henderson procedurally defaulted this claim by failing to present it in state court and cannot show "cause" for this default. The warden is correct.

"[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Hodges v. Colson*, 727 F.3d 517, 529 (6th Cir. 2013) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). "When a petitioner has failed to present the grounds to the state courts and no state remedy remains available, his grounds are procedurally defaulted." *Id.* Thus, in

---

[13] He does not argue, for example, that although it may have been reasonable to advise Henderson to plead guilty, it was not reasonable to waive the jury for sentencing.

general, a petitioner who fails to present a claim in the state courts may not present that claim in federal court "unless he can show cause to excuse his failure to present the claims and actual prejudice to his defense at trial or on appeal." *Id.* (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). Henderson never raised a competency claim in state court, so he must show cause and prejudice to excuse his procedural default.[14]

Henderson argues that trial counsel's ineffectiveness in developing mitigation evidence constitutes cause excusing his default of the competency claim. "[C]ounsel's [unconstitutional] ineffectiveness in failing properly to preserve [a] claim for review in state court will suffice" as "cause" to excuse a procedural default of the unpreserved claim. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (citing *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986)). But "an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted." *Id.* at 453. As the warden points out in his brief, Henderson never attempted to present an ineffective-assistance-of-counsel claim as cause to excuse his failure to raise a competency claim in state court. And while this procedural default is itself subject to the cause and prejudice analysis, *id.,* Henderson has not made such an argument here. Because Henderson never presented an argument in state court that his counsel was ineffective in failing to raise a competency claim, and does not show cause and prejudice justifying his failure to do so, he cannot use ineffectiveness of counsel as "cause" to excuse his default. *See Hodges*, 727 F.3d at 530 (holding that petitioner could not use ineffectiveness-of-counsel as "cause" for defaulted juror-misconduct claim because petitioner never raised this "cause" argument in state-court

---

[14] The Supreme Court's exception to the procedural-default rule recognized in *Martinez*, 566 U.S. at 17, is inapplicable here; *Martinez* applies only to defaulted claims of ineffective assistance of counsel and does not apply to other defaulted claims. *See Hodges*, 727 F.3d at 540 (holding that *Martinez* applies only to defaulted ineffective-assistance-of-counsel claims and thus could not apply to excuse a defaulted competency claim). Further, a petitioner advancing a claim under *Martinez* must show that the claim is "substantial," and Henderson's claim that he was not competent to plead guilty and waive jury sentencing is not substantial based on the record.

proceedings); *Zagorski v. Mays*, 907 F.3d 901, 904-05 (6th Cir. 2018) (similar conclusion). Thus, Henderson fails to show cause to excuse his default.

### C. Ineffectiveness of Counsel at Sentencing (Claim 9)

Henderson's final, and most substantial, argument is that counsel was ineffective at sentencing for failing to perform an adequate mitigation investigation. Had counsel properly investigated his criminal background and personal and family history, Henderson argues, they would have discovered the red-flag crimes he committed, as well as a history of mental illness in his family, and these pieces of information, together with his bicycle accident, would have led to a diagnosis of bipolar disorder and the discovery of brain damage. To support this claim, he relies heavily on evidence introduced for the first time during federal habeas proceedings, including the Gur and Woods reports.

**1.**

A threshold question in analyzing this claim is whether it was decided on the merits or defaulted. In district court, Henderson asserted twenty different sub-claims under Claim 9. But on appeal, he only presses one—Claim 9(n)—which alleges that trial counsel were ineffective in failing to "interview and adequately prepare defense witnesses, resulting in the failure to present to the Court a complete picture of Kennath Henderson." R. 16, PID 108. Henderson's briefs in this court spend almost no time on the threshold question whether this claim was defaulted or decided on the merits. The district court found it to be procedurally defaulted, and Henderson's brief on appeal simply concedes that "there is no question that [Claim 9(n)] was defaulted" due to the ineffectiveness of post-conviction counsel. Appellant Br. at 84.[15]

---

[15] The warden offers no helpful discussion of this issue either. His brief spends only three pages in total on this claim, and consists solely of an assertion that Claim 9(n) was defaulted by "post-conviction appellate counsel's

A close review of the record, however, suggests otherwise. On appeal here, Henderson

bases Claim 9(n) on the same theory that was centrally litigated in the state-court post-conviction

proceedings: that counsel failed to adequately investigate Henderson's criminal background and

family history, and that inadequate investigation meant counsel failed to discover red-flag crimes

and familial-mental-illness evidence, and thus failed to present a full picture of Henderson at

sentencing.[16] *E.g.*, Appellant Br. at 67-70. The crucial, and only, difference is that in state court,

Henderson argued that an adequate investigation would have turned up (i) red-flag behavior, (ii)

family history of mental illness, and (iii) a bipolar diagnosis; and in federal court, he says the same

but adds that it would also have led to the discovery of brain damage. Briefing in the district court

framed Claim 9(n) the same way. R. 129, PID 4660-67.

Apart from the brain damage claim, which we address separately, Henderson's central

allegation—that counsel overlooked crucial pieces of mitigation evidence due to a constitutionally

deficient background investigation—was clearly presented to and decided by the state courts. The

CCA concluded:

> It appears that the crux of the petitioner's complaint is the failure to introduce
> evidence regarding the alleged existence of a bipolar type 2 mental illness. The
> existence of such a mental illness would have been apparent, suggests the
> petitioner, had trial counsel discovered a family history of mental illness and

---

failure to carry the claim forward on appeal," without citing anything in the record to support this position. Appellee Br. at 53.

[16] The post-conviction petition in state court contains a claim using phrasing identical to that used in Claim 9(n). *See* R. 21-14, PID 1146 ("Counsel did not interview and adequately prepare defense witnesses, resulting in the failure to present to the Court a complete picture of Kennath Henderson."). Henderson's post-conviction counsel extensively litigated the same theories raised here in support of Claim 9(n), including on appeal to the CCA. *See, e.g.*, R. 23-15, PID 3163-68. And the CCA's opinion framed these arguments in terms similar to the "failure to present a complete picture" language used in Claim 9(n) and the post-conviction petition, using "complete mitigation profile" instead of "complete picture." *See Henderson*, 2005 WL 1541855 at *41 ("[P]etitioner now alleges that trial counsel was ineffective for failing to present a complete mitigation profile. His complaints include counsel's: (1) failure to interview extended family members to reveal a family history of mental illness; (2) failure to seek additional psychological evaluation to reveal a diagnosis of bipolar disorder; and (3) failure to complete investigation to sufficiently indicate marked changed in behavior, including (a) change in sleep patterns, (b) the fact that his victims were people that he knew, (c) exhibitions of depression, and (d) indication of religious ideation.").

evidence of the petitioner's erratic criminal behavior. Dr. Zager failed to diagnosis [sic] the petitioner with anything more severe than a personality disorder. The petitioner blames this diagnosis on trial counsel's failure to gather sufficient information. . . . [T]he necessary introduction of the petitioner's violent criminal behavior could have undermined this mitigating factor and outweighed any beneficial mitigating impact of the mental illness evidence. This "undiscovered" mitigation evidence raised by the petitioner was correctly characterized by the post-conviction court as being a "double-edged sword."

Given the strength of the proof of aggravating circumstances relied upon by the State, the mitigation evidence that was presented at sentencing and the possible negative impact of the "undiscovered" mitigation evidence, we conclude that had this information been presented to the court there is little reason to believe the trial judge would impose a sentence other than death. The petitioner is not entitled to relief on this basis. *Indeed, in this case, unlike the situation where a jury imposes a death sentence, we are not left to speculate to some degree as to the effect this evidence might have had on the sentencer. The sentencer in this case, the trial judge himself, found this evidence would not have altered the result of the sentencing hearing.*

*Henderson*, 2005 WL 1541855 at *42-*43 (emphasis added). Henderson fails to make any argument in support of his position that the entirety of Claim 9(n) was defaulted, other than noting that the district court found it to be defaulted.[17]

**2.**

Because Claim 9(n) was adjudicated on the merits, § 2254(d)(1) and *Pinholster* apply. Accordingly, our review is limited to the record that existed when the state court adjudicated this claim. The CCA concluded that Henderson could not show prejudice based on the mitigation evidence presented in the post-conviction hearing because Judge Blackwood—the same judge who

---

[17] The district court offered almost no analysis or discussion of how the claim was presented in state court, aside from a sentence asserting that "Henderson asserts that he exhausted this claim when he alleged" trial counsel's failure to develop a relationship with his mother, and that "[a]lthough Henderson addressed his counsel's relationship with his mother, he failed to allege that counsel failed to prepare his mother or any other witness to testify. The claim in [9(n)] was not exhausted and is procedurally defaulted." R. 72, PID 4129-30. Failure to develop a relationship with Henderson's mother, however, was asserted as a distinct claim in both the post-conviction petition, R. 21-14, PID 1142, and federal habeas petition, R. 16, PID 89 (Claim 8(e)). The district court apparently failed to recognize that Henderson's state post-conviction petition included a "complete picture" claim identical to the one in Claim 9(n), and never explained why a claim focused on failure to present an entire mitigation picture of Henderson was somehow limited to the "failure to prepare his mother or any other witness to testify." R. 72, PID 4129-30.

imposed the death penalty—specifically stated that he would have imposed the same sentence even if the newly discovered mitigation evidence and bipolar diagnosis had been presented at sentencing. Henderson makes no argument that the CCA's prejudice determination ran afoul of § 2254(d)(1) on the record before it. It would be difficult to do so. The state court did not reach an objectively unreasonable prejudice determination based on that record. Accordingly, Henderson fails to show entitlement to relief under § 2254 based on his undefaulted Claim 9(n) arguments.

**3.**

Henderson argues that the subclaim involving the failure to uncover and present brain-damage evidence is a separate defaulted claim that he can pursue under *Martinez*. The brain-damage claim was never presented to the state court and is based entirely on the Woods and Gur Reports.

Henderson claims that "[Judge Blackwood did not] know how Mr. Henderson's serious mental illness and significant brain damage compounded each other and contributed to Deputy Bishop's death." *See, e.g.*, Appellant Br. at 74-75; *see also id.* at 75-76 ("Mosier failed to present that Mr. Henderson's brain functioning and behavior is compromised by rapid-cycling bipolar I disorder and frontal lobe damage. As a result of his mental illness, Mr. Henderson suffers from simultaneous mania and depression, which distort his perception of reality. At the same time, Mr. Henderson also has limited ability to control his impulses because of the atrophy of his temporal lobe."); *id.* at 76.

Accepting that the brain-damage claim is separate from the remainder of the mitigation claim, a habeas court's authority under *Martinez* to consider ineffective-assistance-of-counsel evidence first presented in federal court on habeas was significantly limited by the Supreme

Court's recent decision in *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022). *Ramirez* prevents Henderson from introducing evidence of brain damage for the first time in federal court. *Id.* at 1734-35 (holding that "a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel"). Henderson contends that *Ramirez* is inapplicable because he is not "at fault" for the failure to present evidence of his brain damage in state court. He claims that his post-conviction counsel was suffering from such severe mental illness that she effectively "abandoned" him, therefore her conduct cannot be attributed to him for AEDPA purposes. Petitioner Supplemental Briefing at 1, 6-9. Though Dawson and Brockenborough's representation was problematic, we cannot agree that their arguing at the post-conviction hearing that an effective mitigation investigation would have revealed Henderson's bipolar mental illness, and presenting additional evidence of mental-health evaluations, red-flag crimes, and family history in support of that theory—but failing to investigate whether he also suffered brain damage—was so extreme as to constitute abandonment.

*Ramirez* further holds that "under AEDPA and our precedents, state postconviction counsel's ineffective assistance in developing the state-court record is attributed to the prisoner." *Id.* at 1734. "In such a case, a federal court may order an evidentiary hearing or otherwise expand the state-court record only if the prisoner can satisfy § 2254(e)(2)'s stringent requirements."[18] *Id.*

---

[18] Section 2254(e)(2) provides that when a prisoner has "failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim" unless the applicant shows that:

    (A)    the claim relies on

    (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

    (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

Henderson has not satisfied these requirements. Therefore, any evidence of brain damage developed outside the state-court record cannot be considered by this court in this habeas appeal, regardless whether the issue was adjudicated on the merits or procedurally defaulted, and regardless whether the evidence was previously thought to be appropriate for consideration under *Martinez*.

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's denial of Henderson's ineffective-assistance-of-counsel claims concerning his guilty plea, his jury waiver, and his competence to take either of those actions. As for the effectiveness of his counsel at sentencing, the CCA's decision that Henderson was not prejudiced by the failure to develop the bipolar disorder, family mental illness, and bizarre behavior argument was not unreasonable since the trial judge stated that the evidence would not have changed Henderson's sentence. And although the brain damage evidence is different in kind, federal courts may not expand the state-court record. We are thus bound to deny habeas corpus relief.

---

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

**HELENE N. WHITE, Circuit Judge, concurring.** I write separately to address some additional observations. This case is disturbing for a number of reasons. First, of course, is the inexplicable and senseless murder of Deputy Tommy Bishop, who was unconscious when shot in the head.

Also disturbing is that Henderson received ineffective penalty-phase assistance from trial counsel and then again from post-conviction counsel. The medical records from the bicycle/car collision described an injury sufficiently serious that competent death-penalty counsel (and investigators) would have explored the effects of the accident with an expert qualified to make an assessment and offer an opinion. Penalty-phase counsel failed to do so, and post-conviction counsel compounded the error, although by that time additional indicators had become apparent.

The brain-damage claim was completely defaulted in state court, contrary to the district court's determination. And evidence from Dr. Gur and Dr. Woods would have been admissible under *Martinez* because the additional evidence established a substantial claim.

*Martinez*, however, has been nearly gutted as a vehicle for presenting defaulted ineffective-assistance-of-counsel claims. *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022). True, if post-conviction counsel establishes a factual record and simply neglects to make the obvious legal arguments that flow from that evidence, a habeas petitioner may have a successful *Martinez* claim. But it seems to me that counsel will rarely adequately establish the facts only to default the legal argument. Further, a petitioner pursuing a viable claim under *Martinez* has, by definition, been denied the effective assistance of counsel in at his first opportunity to contest trial counsel's effectiveness, and this is so without regard to the adequacy of the factual record made in the state post-conviction court. *See Ramirez*, 142 S. Ct. at 1740 (Sotomayor, J., dissenting).

To avoid *Ramirez*'s bar on expanding the state-court record, Henderson points to counsel's mental illness and her supervisor's indifference and argues that counsel effectively abandoned him by failing to raise the brain-damage argument in the state post-conviction proceeding, and, therefore, he cannot be at fault. But a fair reading of the majority's opinion in *Ramirez* does not allow for such a conclusion.

Notwithstanding a death-penalty prisoner's heinous crime, the Court's death-penalty jurisprudence contemplates that a jury or judge will make this most consequential decision with full knowledge of the prisoner's history. *See, e.g., Williams v. Taylor*, 529 U.S. 362, 393 (2000) (finding an ineffective assistance of counsel claim meritorious and holding that a capital defendant had a constitutionally protected right "to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer," including readily available evidence of childhood abuse, mental impairment, and repeated head injuries); *Wiggins v. Smith*, 539 U.S. 510, 534-35 (2003) (granting habeas relief and finding that counsel's mitigation investigation was constitutionally deficient where counsel failed to uncover or present at sentencing evidence of the capital defendant's severe childhood abuse); *Rompilla v. Beard*, 545 U.S. 374, 378-79 (2005) (finding the defendant entitled to habeas relief based on trial counsel's inadequate mitigation investigation, which failed to uncover easily accessible records of the defendant's "troubled childhood," mental illness, and alcoholism).

To be sure, we do not require a perfect presentation of the evidence pertinent to mitigation, only a reasonable one. And we require that an unreasonably inadequate presentation also cause prejudice to the defendant. But here the sentencing judge had no information at all regarding Henderson's significant structural brain damage or its likely effect on his behavior. And, although Judge Blackwood stated in a district-court filing (not considered by the district court judge based

on *Pinholster*) that the new evidence would not have changed his sentence, that opinion would have been subject to cross-examination at a *Martinez* hearing in light of Judge Blackwood's long involvement in the case. But as the case now stands, Henderson's death sentence was imposed, and will be carried out, without Henderson's having had an adequate opportunity to have his brain-damage considered in mitigation.

I reluctantly concur.